FILED

2013 OCT -2 PM 3: 16

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2012 Grand Jury

| UNITED STATES OF AMERICA, | ) | CR No. 13- **CR 13 00719** |
|---|---|---|
| Plaintiff, | ) ) | I N D I C T M E N T |
| v. | ) ) | [18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering; 18 U.S.C. § 1956(a)(1)(B)(i): Money Laundering; 26 U.S.C. § 7206(1): Filing False Tax Return; 18 U.S.C. § 2(b): Causing an Act to be Done] |
| KHACHATOUR HAKOBYAN, aka "Khachatur Hakobyan," aka "Khachatour Hakopian," aka "Khachatour H. Akopian," aka "Khatchatour Akopian," aka "Khachik," and ARAM ARAMYAN, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTION

At all times relevant to this Indictment:

The Medicare Program

1.   Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who

were over the age of 65 or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

2.   Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each Medicare beneficiary was given a Health Identification Card containing a unique identification number ("HICN").

3.   Durable medical equipment ("DME") supply companies, independent diagnostic testing facilities ("IDTFs"), physicians, physician's assistants ("PAs"), and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

The Defendants and Related Entities

4.   Panarama Group, Inc. ("Panarama") was a corporation registered in the State of Nevada, operating in Glendale, California, within the Central District of California.  Panarama was sometimes spelled "Panorama" on checks for Panarama bank accounts.

5.   Pegas Group, Inc. ("Pegas") was a corporation registered in the State of Nevada, operating in Glendale, California, within the Central District of California.

6.   Univision Group, Inc. ("Univision") was a corporation registered in the State of Nevada, operating in Glendale, California, within the Central District of California.

7.   IFA Group, Inc. ("IFA") was a corporation registered first in the State of Nevada and then in the State of California,

1  operating in Glendale, California, within the Central District of
2  California.

3      8.    UFA Group, Inc. ("UFA") was a corporation registered
4  first in the State of Nevada and then in the State of California,
5  operating in Glendale, California, within the Central District of
6  California.

7      9.    Defendant KHACHATOUR HAKOBYAN, also known as ("aka")
8  "Khachatur Hakobyan," aka "Khachatour Hakopian," aka "Khachatour
9  H. Akopian," aka "Khatchatour Akopian," aka "Khachik" ("defendant
10 HAKOBYAN"), was a resident of Glendale, California, within the
11 Central District of California, and was identified in publicly-
12 filed documents as the Treasurer of Panarama and Pegas and as the
13 President, Secretary, and Director of Univision.  Defendant
14 HAKOBYAN also had signature authority for the bank accounts of
15 Panarama, Pegas, and Univision, which were maintained at
16 Washington Mutual Bank (later JP Morgan Chase Bank), and for one
17 bank account of IFA (from October 2011 to May 2012), which bank
18 account was maintained at Citizens Business Bank.

19     10.   Defendant ARAM ARAMYAN ("defendant ARAMYAN") was a
20 resident of Glendale, California, within the Central District of
21 California, and was identified in publicly-filed documents as the
22 President, Secretary, Treasurer, and Director of IFA and UFA.
23 Defendant ARAMYAN also had signature authority for the bank
24 accounts of IFA and UFA, which were maintained at Washington
25 Mutual Bank (later JP Morgan Chase Bank), Wells Fargo Bank, Bank
26 of the West, Professional Business Bank, Citizens Business Bank,
27 and Pacific Western Bank.  Defendants HAKOBYAN and ARAMYAN often
28

3

1  would visit these banks together to conduct business on behalf of

2  IFA and UFA.

3       11.   There was a medical clinic located at 866 North Vermont

4  Avenue, Los Angeles, California 90029, within the Central

5  District of California (the "Vermont Clinic").   The Vermont

6  Clinic was a Medicare provider from on or about September 4,

7  2007, until on or about February 28, 2008, under one physician,

8  Dr. C.V.S., and from on or about October 2, 2008, until on or

9  about March 24, 2009, under another physician, Dr. W.S.   Two PAs

10  — E.K. and B.C. — were associated with the Vermont Clinic during

11  this time.   E.K. worked at the Vermont Clinic under Dr. C.V.S.,

12  and B.C. worked at the Vermont Clinic under Dr. W.S.   During the

13  period in which Dr. C.V.S. was associated with the Vermont

14  Clinic, the Vermont Clinic maintained a bank account at Wells

15  Fargo Bank, bearing an account number ending in 0028 (the "C.V.S.

16  Vermont Clinic Bank Account"), into which all of the Vermont

17  Clinic's payments from Medicare were deposited.   During the

18  period in which Dr. W.S. was associated with the Vermont Clinic,

19  the Vermont Clinic maintained a bank account at Washington Mutual

20  Bank, bearing an account number ending in 1444 (the "W.S. Vermont

21  Clinic Bank Account"), into which all of the Vermont Clinic's

22  payments from Medicare were deposited.

23       12.   There was a medical clinic located at 274½ South

24  Rampart, Los Angeles, California 90057, within the Central

25  District of California (the "Rampart Clinic").   The Rampart

26  Clinic was a Medicare provider from on or about March 14, 2008,

27  until on or about September 25, 2008.   Dr. P.F. was the physician

28

1 and B.C. was the primary PA associated with the Rampart Clinic
2 during this time.  During the period in which Dr. P.F. was
3 associated with the Rampart Clinic, the Rampart Clinic maintained
4 a bank account at Wells Fargo Bank, bearing an account number
5 ending in 9672 (the "Rampart Clinic Bank Account"), into which
6 all of the Rampart Clinic's payments from Medicare were
7 deposited.

8       13.  Midvalley Medical Supply ("Midvalley") was a DME supply
9 company located at 15246 Saticoy Street, Van Nuys, California
10 91405, within the Central District of California.  Midvalley was
11 a Medicare provider from on or about September 13, 2007, until on
12 or about October 27, 2009.  Co-conspirator S.A. was enrolled with
13 Medicare as the owner and managing employee of Midvalley from on
14 or about September 13, 2007, until on or about July 7, 2008.
15 During this period, Midvalley maintained a bank account at
16 Washington Mutual Bank, bearing an account number ending in 2226
17 (the "Midvalley Bank Account"), into which all of Midvalley's
18 payments from Medicare were deposited.

19       14.  Co-conspirator S.A. also worked at the Vermont Clinic
20 between on or about October 1, 2007, and in or about February
21 2008, and again between in or about October 2008, and in or about
22 March 2009.

23       15.  Co-conspirator S.A. also worked at the Rampart Clinic
24 between in or about March 2008, and in or about September 2008.

25       16.  Between on or about October 1, 2007, and in or about
26 February 2008, the Vermont Clinic billed Medicare approximately
27 $428,819 for services allegedly provided by E.K. to Medicare

28

5

1   beneficiaries at the clinic, and Medicare paid the Vermont Clinic
2   approximately $272,930.72 for those claims.

3       17.   During that same time period, Medicare providers —
4   including DME suppliers and IDTFs — submitted to Medicare claims
5   totaling approximately $5,216,443.50 for DME, nerve conduction
6   velocity studies ("NCVs"), and other diagnostic tests that were
7   prescribed or ordered by E.K. at the Vermont Clinic, for which
8   Medicare paid those Medicare providers approximately
9   $2,303,099.84.

10      18.   In addition, between on or about November 16, 2007, and
11  on or about February 14, 2008, Midvalley submitted approximately
12  $104,363 in claims to Medicare for DME prescribed or ordered by
13  E.K., and Medicare paid Midvalley approximately $71,046.45 for
14  those claims.

15      19.   Between in or about April 2008 and in or about
16  September 2008, Medicare providers — including DME suppliers and
17  IDTFs — submitted to Medicare claims totaling approximately
18  $12,316,290.04 for DME, NCVs, and other diagnostic tests that
19  mostly were prescribed or ordered by B.C. at the Rampart Clinic,
20  for which Medicare paid those Medicare providers approximately
21  $4,721,745.47.

22      20.   Between in or about November 2008 and in or about March
23  2009, Medicare providers — including DME suppliers and IDTFs —
24  submitted to Medicare claims totaling approximately $6,231,636.69
25  for DME, NCVs, and other diagnostic tests that mostly were
26  prescribed or ordered by B.C. at the Vermont Clinic, for which
27  Medicare paid those Medicare providers approximately

28

1 | $1,907,300.54.

2 |     21.   Zuz Diagnostic Laboratories, Inc. ("Zuz Diagnostic")

3 | was an IDTF located at 6448 Lankershim, North Hollywood,

4 | California 91606, within the Central District of California, that

5 | purportedly provided medical testing services, including sleep

6 | studies.   Zuz Diagnostic was operated by co-conspirator K.S. and

7 | was a Medicare provider from in or about December 2004 until in

8 | or about September 2007.   During this period, Medicare paid Zuz

9 | Diagnostic approximately $980,478.26 for claims it submitted to

10 | Medicare.   During this period, Zuz Diagnostic maintained bank

11 | accounts at Bank of America and Wells Fargo Bank.

12 | B.    THE OBJECT OF THE CONSPIRACY

13 |     22.   Beginning on a date unknown but as early as in or about

14 | January 2007, and continuing until the present, in Los Angeles

15 | County, within the Central District of California, and elsewhere,

16 | defendants HAKOBYAN and ARAMYAN, together with co-conspirators

17 | S.A., K.S., and others known and unknown to the Grand Jury,

18 | knowingly combined, conspired, and agreed to commit the following

19 | offense against the United States:   Money laundering, in

20 | violation of Title 18, United States Code, Section

21 | 1956(a)(1)(B)(i), to conceal and disguise the nature, location,

22 | source, ownership, and control of proceeds of specified unlawful

23 | activity, namely, health care fraud committed in violation of

24 | Title 18, United States Code, Section 1347.

25 | C.    THE MANNER AND MEANS OF THE CONSPIRACY

26 |     23.   The object of the conspiracy was carried out, and to be

27 | carried out, in substance, in the following manner and by the

28 |

7

1  following means, among others:

2          a.   Co-conspirators S.A., K.S., and others known and

3  unknown to the Grand Jury, would write checks from the bank

4  accounts of Medicare providers such as Midvalley, Zuz Diagnostic,

5  the Vermont Clinic, and the Rampart Clinic, to Panarama, Pegas,

6  Univision, IFA, and UFA, from the proceeds of health care fraud.

7  These co-conspirators would falsely indicate on some of the

8  checks that the checks were payments for services such as

9  advertising, investment, consulting, management, or professional

10 or technical services.

11         b.   Defendant HAKOBYAN would deposit these checks into

12 the bank accounts of Panarama, Pegas, and Univision, and

13 defendant ARAMYAN would deposit these checks into the bank

14 accounts of IFA and UFA.

15         c.   Defendant HAKOBYAN subsequently would write checks

16 from the bank accounts of Panarama, Pegas, and Univision, and

17 defendant ARAMYAN subsequently would write checks from the bank

18 accounts of IFA and UFA, to certain individuals, including N.A.

19 (collectively, "the check-cashers"), and to themselves, and would

20 falsely indicate on some of the checks that the checks were for

21 legitimate business expenses, such as "Nordstrom show 2007,"

22 "Travel Exp to Oregon (Portland) Dec 2007," "Travel to Bahamas,"

23 "travel & bonus," "travel exp NY," "commission for Oregon acct,"

24 "gas & mileage," "travel to New York," "business purposes,"

25 "payment for work," and "remodeling expense."  Nearly all of

26 these checks were payable in amounts less than $10,000.00.

27         d.   Defendants HAKOBYAN and ARAMYAN, as well as the

28

8

1   check-cashers acting at their direction, then would cash some of

2   the checks.   The check-cashers would provide the cash to

3   defendants HAKOBYAN and ARAMYAN.   Defendants HAKOBYAN and

4   ARAMYAN, in turn, would return the cash to the co-conspirators,

5   often less an approximately 10% commission as payment for having

6   laundered the proceeds generated by health care fraud.

7           e.   Defendants HAKOBYAN and ARAMYAN would deposit some

8   of the checks into their personal bank accounts rather than

9   cashing them.

10          f.   Defendants HAKOBYAN and ARAMYAN would use some of

11  the funds from Panarama, Pegas, Univision, IFA, and UFA to pay

12  their personal expenses, such as mortgage payments, homeowners'

13  association fees, and home remodeling costs.

14          g.   In a further effort to conceal the health care

15  fraud proceeds received from co-conspirators S.A., K.S., and

16  others known and unknown to the Grand Jury, defendants HAKOBYAN

17  and ARAMYAN also would under-report the income received from

18  these co-conspirators on the corporate tax returns for Panarama,

19  Pegas, IFA, and UFA.

20          h.   In addition, in order to conceal the health care

21  fraud proceeds received from co-conspirators S.A., K.S., and

22  others known and unknown to the Grand Jury, defendants HAKOBYAN

23  and ARAMYAN would under-report their own income from Panarama,

24  Pegas, Univision, IFA, and UFA and from these co-conspirators on

25  their personal tax returns.

26          i.   During the course of the conspiracy, defendants

27  HAKOBYAN and ARAMYAN laundered millions of dollars of health care

28

fraud proceeds through Panarama, Pegas, Univision, IFA, and UFA.

D.    OVERT ACTS

24.    In furtherance of the conspiracy and to accomplish its object, defendants HAKOBYAN and ARAMYAN, together with co-conspirators S.A., K.S., and others known and unknown to the Grand Jury, committed and willfully caused others to commit the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:  On or about January 11, 2007, defendant ARAMYAN cashed check number 1051, drawn on a Panarama bank account, made payable to defendant ARAMYAN, and signed by defendant HAKOBYAN, in the amount of $9,850.00.

Overt Act No. 2:  On or about March 13, 2007, defendant HAKOBYAN received from K.S. check number 1729, drawn on a Zuz Diagnostic bank account, signed by K.S., and made payable to Panarama in the amount of $7,000.00.

Overt Act No. 3:  On or about March 30, 2007, N.A. cashed check number 1042, drawn on a Pegas bank account, made payable to N.A., and signed by defendant HAKOBYAN, in the amount of $5,750.00.

Overt Act No. 4:  On or about April 3, 2007, N.A. cashed check number 1167, drawn on a Panarama bank account, made payable to N.A., and signed by defendant HAKOBYAN, in the amount of $8,750.00.

Overt Act No. 5:  On or about April 11, 2007, defendant HAKOBYAN cashed check number 1173, drawn on a Panarama bank account and made payable to and signed by defendant HAKOBYAN, in

10

the amount of $5,750.00.

Overt Act No. 6:  On or about April 25, 2007, defendant ARAMYAN cashed check number 1066, drawn on a Pegas bank account, made payable to defendant ARAMYAN, and signed by defendant HAKOBYAN, in the amount of $9,700.00.

Overt Act No. 7:  On or about June 11, 2007, defendant HAKOBYAN received from K.S. check number 1868, drawn on a Zuz Diagnostic bank account, signed by K.S., and made payable to Panarama  in the amount of $5,000.00.

Overt Act No. 8:  On or about July 30, 2007, defendant HAKOBYAN cashed check number 1339, drawn on a Panarama bank account and made payable to and signed by defendant HAKOBYAN, in the amount of $3,000.00.

Overt Act No. 9:  On or about December 19, 2007, an unknown co-conspirator issued check number 112, drawn on the C.V.S. Vermont Clinic Bank Account and made payable to Pegas in the amount of $14,324.00.

Overt Act No. 10:  On or about December 20, 2007, an unknown co-conspirator issued check number 113, drawn on the C.V.S. Vermont Clinic Bank Account and made payable to Univision in the amount of $18,286.00.

Overt Act No. 11:  On or about January 15, 2008, N.A. cashed check number 1415, drawn on a Panarama bank account, made payable to N.A., and signed by defendant HAKOBYAN, in the amount of $5,750.00.

Overt Act No. 12:  On or about February 25, 2008, S.A. signed check number 173, drawn on the Midvalley Bank Account and

1    made payable to Pegas in the amount of $7,249.00.

2        Overt Act No. 13:  On or about February 27, 2008, S.A.

3    signed check number 172, drawn on the Midvalley Bank Account and

4    made payable to Univision in the amount of $6,500.00.

5        Overt Act No. 14:  On or about July 16, 2008, defendant

6    HAKOBYAN cashed check number 1014, drawn on an UFA bank account,

7    made payable to defendant HAKOBYAN, and signed by defendant

8    ARAMYAN, in the amount of $2,250.00.

9        Overt Act No. 15:  On or about August 15, 2008, defendant

10    ARAMYAN cashed check number 1044, drawn on an UFA bank account,

11    and made payable to and signed by defendant ARAMYAN, in the

12    amount of $9,850.00.

13        Overt Act No. 16:  On or about September 16, 2008, defendant

14    HAKOBYAN cashed check number 1070, drawn on an UFA bank account,

15    dated September 16, 2008, made payable to defendant HAKOBYAN, and

16    signed by defendant ARAMYAN, in the amount of $7,000.00.

17        Overt Act No. 17:  On or about September 18, 2008, defendant

18    HAKOBYAN cashed check number 1003, drawn on an IFA bank account,

19    dated September 16, 2008, made payable to defendant HAKOBYAN, and

20    signed by defendant ARAMYAN, in the amount of $3,000.00.

21        Overt Act No. 18:  On or about October 1, 2008, an unknown

22    co-conspirator issued check number 1025, drawn on the Rampart

23    Clinic Bank Account and made payable to UFA in the amount of

24    $10,125.00.

25        Overt Act No. 19:  On or about October 2, 2008, an unknown

26    co-conspirator issued check number 1026, drawn on the Rampart

27    Clinic Bank Account and made payable to IFA in the amount of

28

$12,865.00.

Overt Act No. 20:  On or about October 27, 2008, an unknown co-conspirator issued check number 1028, drawn on the Rampart Clinic Bank Account and made payable to UFA in the amount of $35,000.00.

Overt Act No. 21:  On or about October 27, 2008, an unknown co-conspirator issued check number 1029, drawn on the Rampart Clinic Bank Account and made payable to IFA in the amount of $35,000.00.

Overt Act No. 22:  On or about January 6, 2009, defendant ARAMYAN cashed check number 1142, drawn on an UFA bank account and made payable to and signed by defendant ARAMYAN, in the amount of $5,300.00.

Overt Act No. 23:  On or about June 5, 2009, an unknown co-conspirator issued check number 1005, drawn on the W.S. Vermont Clinic Bank Account and made payable to IFA in the amount of $10,145.00.

Overt Act No. 24:  On or about June 27, 2009, an unknown co-conspirator issued check number 1021, drawn on the W.S. Vermont Clinic Bank Account and made payable to UFA in the amount of $10,900.00.

Overt Act No. 25:  On or about July 4, 2009, an unknown co-conspirator issued check number 1027, drawn on the W.S. Vermont Clinic Bank Account and made payable to UFA in the amount of $10,500.00.

Overt Act No. 26:  On or about October 26, 2009, defendant ARAMYAN cashed check number 1100, drawn on an UFA bank account

and made payable to and signed by defendant ARAMYAN, in the amount of $4,813.00.

Overt Act No. 27:  On or about January 25, 2011, defendant ARAMYAN opened bank accounts for IFA and UFA at Professional Business Bank in Glendale, California.

Overt Act No. 28:  In or about May 2011, when defendant ARAMYAN closed the IFA and UFA bank accounts at Professional Business Bank, defendant ARAMYAN wrote a check from the UFA account payable to defendant HAKOBYAN in the amount of $9,500.00 and asked the teller to issue a cashier's check for the remaining balance, after first confirming with the teller that checks in these amounts would not be reported in a Currency Transaction Report.

Overt Act No. 29:  In or about May 2011, when defendant ARAMYAN closed the IFA and UFA bank accounts at Professional Business Bank, defendant HAKOBYAN, who was with defendant ARAMYAN at the bank, immediately went to another teller window at the bank, cashed the $9,500.00 check defendant ARAMYAN had written from the UFA account, and complained when the teller who cashed the check asked for defendant HAKOBYAN's Social Security number.

COUNTS TWO THROUGH NINE

[18 U.S.C. §§ 1956(a)(1)(B)(i), 2(b)]

25.   The Grand Jury hereby repeats and alleges paragraphs 1-23 of this Indictment as if fully set forth herein.

26.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendants HAKOBYAN and ARAMYAN, together with others known and unknown to the Grand Jury, knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, conducted and willfully caused others to conduct the following financial transactions affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that each of the transactions was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|----------------------|
| TWO | 10/6/2008 | Negotiation of check number 1026, drawn on the Rampart Clinic Bank Account, in the amount of $12,865.00, made payable to IFA. |
| THREE | 10/8/2008 | Negotiation of check number 1025, drawn on the Rampart Clinic Bank Account, in the amount of $10,125.00, made payable to UFA. |
| FOUR | 10/31/2008 | Negotiation of check number 1028, drawn on the Rampart Clinic Bank Account, in the amount of $35,000.00, made payable to UFA. |

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| FIVE | 10/31/2008 | Negotiation of check number 1029, drawn on the Rampart Clinic Bank Account, in the amount of $35,000.00, made payable to IFA. |
| SIX | 6/9/2009 | Negotiation of check number 1005, drawn on the Vermont Clinic Bank Account, in the amount of $10,145.00, made payable to IFA. |
| SEVEN | 6/29/2009 | Negotiation of check number 1021, drawn on the Vermont Clinic Bank Account, in the amount of $10,900.00, made payable to UFA. |
| EIGHT | 7/8/2009 | Negotiation of check number 1027, drawn on the Vermont Clinic Bank Account, in the amount of $10,500.00, made payable to UFA. |

COUNTS NINE THROUGH THIRTEEN

[26 U.S.C. § 7206(1)]

27.  On or about the dates listed below, in Los Angeles County, within the Central District of California, and elsewhere, defendant KHACHATOUR HAKOBYAN, also known as ("aka") "Khachatur Hakobyan," aka "Khachatour Hakopian," aka "Khachatour H. Akopian," aka "Khatchatour Akopian," aka "Khachik" ("defendant HAKOBYAN"), willfully made and subscribed to a United States Individual Income Tax Return, Form 1040, for each of the calendar years listed below, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, and which defendant HAKOBYAN did not believe to be true and correct as to every material matter contained therein, in that defendant HAKOBYAN reported income on line item 22, for the amounts shown below, and elsewhere on Form 1040, whereas, as defendant HAKOBYAN then well knew, these figures substantially under-reported defendant HAKOBYAN's true income:

| COUNT | DATE FILED OR RECEIVED BY IRS | TAX YEAR | FALSELY REPORTED INCOME |
|-------|-------------------------------|----------|-------------------------|
| NINE | 4/15/2008 | 2007 | $23,379.00 |
| TEN | 4/15/2009 | 2008 | $47,806.00 |
| ELEVEN | 10/27/2010 | 2009 | $31,915.00 |
| TWELVE | 4/15/2011 | 2010 | $27,289.00 |
| THIRTEEN | 8/30/2012 | 2011 | $67,442.00 |

COUNTS FOURTEEN THROUGH EIGHTEEN

[26 U.S.C. § 7206(1)]

28.   On or about the dates listed below, in Los Angeles
County, within the Central District of California, and elsewhere,
defendant ARAM ARAMYAN ("defendant ARAMYAN") willfully made and
subscribed to a United States Individual Income Tax Return, Form
1040, for each of the calendar years listed below, which was
verified by a written declaration that it was made under the
penalties of perjury and was filed with the Internal Revenue
Service, and which defendant ARAMYAN did not believe to be true
and correct as to every material matter contained therein, in
that defendant ARAMYAN reported income on line item 22, for the
amounts shown below, and elsewhere on Form 1040, whereas, as
defendant ARAMYAN then well knew, these figures substantially
under-reported defendant ARAMYAN's true income:

///
///
///
///
///
///
///
///
///
///
///
///

18

| COUNT | DATE FILED OR RECEIVED BY IRS | TAX YEAR | FALSELY REPORTED INCOME |
|---|---|---|---|
| FOURTEEN | 4/15/2008 | 2007 | $16,183.00 |
| FIFTEEN | 4/15/2009 | 2008 | $9,279.00 |
| SIXTEEN | 4/15/2010 | 2009 | $21,085.00 |
| SEVENTEEN | 4/15/2011 | 2010 | $27,809.00 |
| EIGHTEEN | 4/15/2012 | 2011 | $34,156.00 |

A TRUE BILL

/S/
_____
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD E. ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

CONSUELO S. WOODHEAD
Assistant United States Attorney
Deputy Chief, Major Frauds Section

CATHY J. OSTILLER
Assistant United States Attorney
Major Frauds Section

KRISTEN A. WILLIAMS
Assistant United States Attorney
Major Frauds Section